# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

THE CITY OF PROVIDENCE, RHODE ISLAND,

                Plaintiff,

      v.

ALLERGAN PLC, ACTAVIS PLC, LANNETT COMPANY, INC., PAR PHARMACEUTICAL COMPANIES, INC., IMPAX LABORATORIES, INC., MYLAN INC. and WEST-WARD PHARMACEUTICAL CORP.,

                Defendants.

Civ. Action No. _____

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff The City of Providence, Rhode Island ("Providence"), individually and on behalf of a class of all those similarly situated, brings this action for treble damages and injunctive relief against Allergan plc, Actavis plc, Lannett Company, Inc., Par Pharmaceutical Companies, Inc., Impax Laboratories, Mylan Inc. and West-Ward Pharmaceutical Corp. (collectively, "Defendants") for violations of the Sherman Antitrust Act ("Sherman Act"), the Clayton Antitrust Act ("Clayton Act") and under the laws of the several states identified herein as well as the District of Columbia.  Based on counsel's investigation, research and review of publicly available documents, on Plaintiff's personal knowledge, and upon information and belief, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.      Over the past sixteen years, numerous antitrust class actions have been brought against branded and generic manufacturers on the ground that they have entered into "reverse payment" agreements in restraint of trade in violation of federal and/or state antitrust laws. Plaintiffs in those cases, including wholesalers, health insurers, union health and welfare plans and consumers, alleged that the unlawful "reverse payment" agreements prevented a less expensive generic version of the branded product from more timely entering the market, thereby forcing them to purchase the branded product.

2.      In this case, Providence alleges that the manufacturers of generic Digoxin and Doxycycline similarly entered into an unlawful agreement to fix, raise, maintain or stabilize the price of these generic drugs. Doxycycline, a fairly common antibiotic used to treat a wide variety of infections, went from an average market price in October 2013 of $20 to an astonishing $1,849

in April 2014 – an increase of 8,281%.[1]  Prices for a widely prescribed medication used to treat atrial fibrillation, atrial flutter or heart failure, Digoxin, have similarly increased. In some instances Digoxin prices have increased more than 800% from 2012 to present.

3.     The Government has commenced an investigation into price spikes of generic drugs.  Actavis (now Allergan), Lannett, Par, Impax and Mylan have all received subpoenas from the U.S. Department of Justice ("DOJ").[2]  All of the Defendants also received a letter seeking information concerning generic Doxycycline and/or Digoxin pricing from Senator Bernard Sanders and Congressman Elijah E. Cummings in October 2014.  Investigations into the generic Digoxin and Doxycycline markets have been launched by the DOJ and the Connecticut Attorney General's Office, with both entities subpoenaing records related to the three players in the generic Digoxin and/or Doxycycline markets.

4.     Congress has also launched an investigation into generic drug pricing.  Digoxin and Doxycycline are two of the primary drugs upon which the investigation is focused.[3]

5.     The conspiracy related to generic Doxycycline and Digoxin may have been accomplished, in part, through the use of trade organizations.  Policy and Regulatory Report ("PaRR") reported the DOJ is looking closely "'at trade associations as part of their investigation

---

[1]   *See*   http://www.sanders.senate.gov/download/face-sheet-on-generic-drug-price-increases?inline=file relating data provided to Congress by the Healthcare Supply Chain Association ("HSCA") on recent purchases by group purchasing organizations ("GPOs") of ten generic drugs.

[2]   At present, it is unknown whether West-Ward also received a subpoena, because its foreign parent, Hikma Pharmaceuticals PLC, does not make disclosures to the U.S. Securities and Exchange Commission ("SEC").

[3]   The investigation encompasses generic drugs other than Digoxin and Doxycycline and plaintiff reserves the right to amend its Complaint to add more parties and/or claims as more information regarding the governmental investigations is revealed.

as having been one potential avenue for facilitating the collusion between salespeople at different generic producers.'"[4]   As described below, several of the Defendants here are members of the largest trade organization dedicated to issues related to generic drugs.   Moreover, the investigative subpoenas that have been issued, with a focus on sales personnel, indicate that trade associations may have been used to facilitate the unlawful communications.

6.     As a direct and indirect proximate result of this conspiracy to fix generic Digoxin and Doxycycline, Plaintiff and members of the Class have been injured.

## JURISDICTION AND VENUE

7.     Plaintiff's claim for injuries sustained by reason of Defendants' violations of §§1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3, are brought pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to obtain injunctive relief and the costs of this suit, including reasonable attorneys' fees. This Court has original federal question jurisdiction over the Sherman Act claims asserted in this Complaint, pursuant to 28 U.S.C. §§1331 and 1337, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26. The Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. §1367.

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

---

[4] Eric Palmer, *DOJ criminal probe takes a look at trade associations*, FIERCEPHARMA, July 10, 2015, http://www.fiercepharma.com/story/doj-criminal-probe-takes-look-trade-associations/2015-07-10

9.      Venue is proper in this judicial district pursuant to §§4(a) and 12 of the Clayton Act, 15 U.S.C. §§15(a) and 22, and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period one or more of the Defendants resided, transacted business, were found, or had agents in this district, a substantial part of the events giving rise to Plaintiff's claims occurred in this district, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

10.     Venue is also proper because each of the Defendants operates and transacts business within the district, each of the Defendants has substantial contacts with this district, and each of the Defendants engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in the district.

## THE PARTIES

### Plaintiff

11.     City of Providence, Rhode Island ("Providence") is a municipal corporation with a principal address of 25 Dorrance Street, Providence, Rhodes Island. Providence is a self-insured health and welfare plan, and purchases, pays, and/or provides reimbursement for its employees, retirees, and/or plan beneficiaries for some or all of the purchases of prescription drugs including generic Digoxin and Doxycycline. Providence indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of generic Doxycycline for employees or retirees who reside or purchased in Arizona, California, Florida, Illinois, Massachusetts, Maine, Mississippi, North Carolina, New Hampshire, New Mexico, Nevada, New York, Rhode Island, Tennessee, The U.S. Virgin Islands, Vermont, Washington, D.C., and Wisconsin. Additionally, Providence indirectly purchased, paid, and/or provided reimbursement for some or all of the

purchase price of Digoxin for people who reside or purchased in Florida, Illinois, Massachusetts, North Carolina, New Hampshire, New York, and Rhode Island.  As a direct and proximate result of Defendants' anticompetitive conduct, Providence paid more for generic Digoxin and Doxycycline than it would have absent Defendants' unlawful anticompetitive conduct and was injured as a result thereof. Providence intends to continue to purchase, pay for, and/or provide reimbursement for some or all of the purchase price of generic Digoxin and Doxycycline and will, therefore, continue to suffer injury absent an injunction.

**Defendants**

12.    Allergan plc, formerly Actavis plc, is a company organized under the laws of Ireland with its principal executive offices located at 1 Grand Canal Square, Docklands, Dublin 2, Ireland, and its administrative headquarters located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey.

13.    In March of 2015, Actavis plc acquired Allergan, Inc., and as of June 2015 officially changed its name to Allergan plc. Allergan plc's U.S. generics business continues to operate under the name Actavis and has its principal executive offices at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey. The foregoing Defendants will collectively be referred to as "Actavis".

14.    Lannett Company, Inc. ("Lannett") is a company organized under the laws of Delaware with its principal executive offices at 13200 Townsend Road, Philadelphia, Pennsylvania.

15.    Par Pharmaceutical Companies, Inc. ("Par"), is a company organized under the laws of Delaware with its principal executive offices at One Ram Ridge Road, Chestnut Ridge, New York. Par is a wholly-owned subsidiary of Endo International plc, a company organized

under the laws of Ireland with its principal executive offices at Minerva House, First Floor, Simmonscourt Road, Ballsbridge, Dublin 4, Ireland.

16.     Impax Laboratories, Inc. ("Impax") is a company organized under the laws of Delaware with its principal executive offices at 30831 Huntwood Avenue, Hayward, California.

17.     Mylan Inc. is a company organized under the laws of Pennsylvania with its principal executive offices at 1000 Mylan Boulevard, Canonsburg, Pennsylvania. Mylan is a wholly-owned subsidiary of Mylan N.V., a company organized under the laws of the Netherlands with its principal executive offices at Building 4, Trident Place, Mosquito Way, Hatfield Hertfordshire, England.

18.     West-Ward Pharmaceutical Corp. ("West-Ward") is a company organized under the laws of Delaware with its principal executive offices at 401 Industrial Way West, Eatontown, New Jersey. West-Ward is a wholly-owned subsidiary of Hikma Pharmacueticals PLC, a company organized under the laws of the United Kingdom with its principal executive offices at 13 Hanover Square, London, W1S 1HW, United Kingdom.

19.     All acts alleged in this Complaint to have been done by Defendants were performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

**Co-Conspirators**

20.     Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein.  In order to engage in the offenses charged and violations alleged herein, these co-conspirators have

performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

21.    At all relevant times, each Defendant was an agent of each of the remaining Defendants, and was acting within the course and scope of such agency.  Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants.  Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## REGULATORY FRAMEWORK

### A.    NDA Approval and the Hatch-Waxman Act

22.    Under the federal Food, Drug, and Cosmetics Act ("FDC Act"), 21 U.S.C. §§ 301-392, a manufacturer who creates a new, pioneer drug must obtain the approval of the U.S. Food and Drug Administration ("FDA") to sell the new drug by filing a New Drug Application ("NDA").  An NDA must include submission of specific data concerning the safety and efficacy of the drug, as well as any information on applicable patents.

23.    Upon FDA approval of a brand-name manufacturer's NDA, it is published in the "Approved Drug Products with Therapeutic Equivalence Evaluations" (commonly referred to as the "Orange Book"). The Orange Book lists any patents: (i) that the brand-name manufacturer claims the approved drug or its approved uses; and (ii) for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1); 21 U.S.C. § 355(j)(7)(A)(iii).

24.    In 1984, Congress amended the FDC Act with the enactment of the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984), commonly referred to as the "Hatch-Waxman Act."

25.     The Hatch-Waxman Act simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file a lengthy and costly NDA in order to obtain FDA approval. The Act provides an expedited review process by which generic manufacturers may file an Abbreviated New Drug Application ("ANDA").

26.     The ANDA relies on the scientific findings of safety and efficacy included by the brand-name drug manufacturer in the original NDA. The ANDA filer, however, must scientifically demonstrate to the FDA that the generic drug it is going to market is just as safe and effective as the corresponding brand-name drug through demonstrations of bioequivalence. A demonstration of bioequivalence means that, within certain set parameters of variability, the generic product delivers the same amount of active ingredient into the patient's blood stream for the same amount of time as the corresponding brand drug. The range of acceptable variability afforded to generic drugs for demonstrating bioequivalence is the same lot-to-lot (*i.e.*, batch-to-batch) range of variability afforded to brand companies when manufacturing their own brand drug.

27.     Generally speaking, ANDA filers that demonstrate bioequivalence seek to have their generic products deemed to be "AB-rated" to the corresponding brand-name drug, sometimes referred to as the "reference listed drug." AB-rated generics are those that have been determined by the FDA to be therapeutically equivalent (*i.e.*, bioequivalent) and pharmaceutically equivalent to their brand-name counterparts. Pharmaceutical equivalence means the generic drug and branded reference listed drug have, among other things, the same active ingredient, same strength, same route of administration, and same dosage form. Generic drugs that do not fulfill all of these requirements cannot be deemed to be AB-rated to the targeted reference listed drug.

28.     FDA approval of an ANDA requires a generic manufacturer's ANDA to contain one of the following four certifications: (i) the brand-name drug has no patent associated with it

(a "Paragraph I certification"); (ii) the brand-name drug's patents have expired (a "Paragraph II certification"); (iii) the brand-name drug's patents will expire before the generic enters the market (a "Paragraph III certification"); or (iv) the patent for the brand-name drug is invalid or will not be infringed by the generic product (a "Paragraph IV certification"). 21 U.S.C. § 355(j)(2)(A)(vii).

29.     If a generic manufacturer files a Paragraph IV certification that the listed patent is invalid or will not be infringed, it must promptly give notice to both the NDA owner and the owner of the patent(s) at issue. The filing of an ANDA with a Paragraph IV certification gives rise to a cause of action for patent infringement. 35 U.S.C. § 271(e)(2)(A). If the patent owner initiates an infringement action against the ANDA filer within 45 days, then the FDA may not finally approve the ANDA until the earlier of either 30 months or the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. § 355(j)(5)(B)(iii). If, however, the patent owner fails to initiate a patent infringement action within 45 days after receiving notice of the generic manufacturer's Paragraph IV certification, the FDA may grant final approval to the generic manufacturer's ANDA upon satisfying itself as to the safety and efficacy of the generic product. Accordingly, the timely filing of an infringement action provides the patent owner with the equivalent of a 30-month automatic preliminary injunction. Prompt disposition of such an action, as through a motion for summary judgment, may mean more rapid approval for a generic manufacturer subject to such a stay.

30.     To encourage generic manufacturers to challenge branded drug patents and/or to design around them, the Hatch-Waxman Act grants the first Paragraph IV ANDA filer(s) a 180-day exclusivity period to market the generic version of the drug, during which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand-name drug. 21 U.S.C. § 355(j)(5)(B)(iv) and 21 U.S.C. § 355(j)(5)(D).

31.     Typically, AB-rated generic versions of brand-name drugs are priced significantly

below the brand-name counterparts. Because of the price differentials, and other institutional features of the pharmaceutical market, AB-rated generic versions are rapidly and substantially substituted for their brand-name counterparts. When multiple generic manufacturers enter the market, prices for generic versions of a drug predictably decrease significantly because of competition among the generic manufacturers, and because the loss of sales volume by the brand-name drug to the corresponding generics is dramatic.

32.     An AB rating is particularly significant to a generic manufacturer because, under the statutory regime enacted by Congress (*i.e.*, the Hatch-Waxman Act) and most state legislatures (*i.e.*, Drug Product Selection laws, or "DPS laws"), pharmacists may (and, in most states, must) substitute an AB-rated generic version of a drug for the brand-name drug without seeking or obtaining permission from the prescribing doctor. Indeed, both Congress and state legislatures have actively encouraged generic substitution because of their recognition that the economics of the pharmaceutical industry prevent generic manufacturers from simultaneously: (i) engaging in the type of heavy promotion or "detailing" typically done by brand-name manufacturers; and (ii) providing the enormous cost savings to purchasers and consumers generated by generic drugs.

33.     Generic competition enables Plaintiff to: (i) purchase generic versions of brand-name drugs at substantially lower prices; and/or (ii) purchase the brand-name drug at reduced prices.

**B.      AB-rated Generic Versions of Brand-Name Drugs Are Significantly Less Expensive, and Take Significant Sales Directly from the Corresponding Brand-Name Versions**

34.     Competition from lower-priced AB-rated generic drugs saves American consumers $8 to $10 billion a year. As set forth *infra*, however, these consumer savings mean lower profits for brand name drug companies. It is well-established that when AB-rated generic

entry occurs, the brand name drug company suffers a rapid and steep decline in sales and profits on its reference listed drug.

### C.     The Hatch-Waxman Amendments

35.     The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.  *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).  A manufacturer seeking approval to sell a generic version of a brand drug may instead file an ANDA.  An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA, and must further show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug.  This establishes that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug. The FDA assigns generic drugs that are therapeutically equivalent to and are of the same dosage strength and form as their brand counterpart an "AB" rating.

36.     The FDCA and Hatch-Waxman Amendments operate on the proven scientific principle that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same relative extent and for the same amount of time as the brand counterpart. 21 U.S.C. § 355G)(8)(B).

37.     Congress enacted the Hatch-Waxman Amendments to expedite the entry of less-expensive generic competitors to brand drugs, thereby reducing healthcare expenses nationwide.

Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

38.     The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic high profit margins for brand manufacturers. In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenue for brand and generic drugs totaled $21.6 billion; by 2013, total prescription drug revenue had climbed to more than $329.2 billion, with generic drugs accounting for 86% of prescriptions.[5] Generics are now dispensed 95% of the time when a generic form is available.[6]

### D.     ANDA Paragraph IV Certification

39.     If a generic manufacturer files a Paragraph IV certification, it must notify the brand manufacturer, and the brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement.  If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification, the FDA will not grant final approval to the ANDA until the earlier of: (i) the passage of 30 months from the date of receipt of the Paragraph IV notice; or (ii) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. § 355(j)(5)(B)(iii). Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer

---

[5] *See* IMS Institute for Healthcare in Formatics, *Medicine Use and Shifting Costs of Healthcare* at 30, 51 (Apr. 2014).

[6] *Id.* at 51.

to market its product (*i.e.*, grant final approval).  The FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30 month stay.

*First-filer's 180-day exclusivity period*

40.     Generics may be classified as: (i) first-filer generics; (ii) later generic filers; and (iii) the brand's own authorized generic.

41.     To encourage manufacturers to seek approval of generic versions of brand drugs, the Hatch-Waxman Amendments grant the first generic manufacturer who files an ANDA with a Paragraph IV certification (the "first-filer") a 180-day period to exclusively market the generic version of the drug, during which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand drug.  21 U.S.C. § 355(j)(5)(B)(iv) and 21 U.S.C. § 355(j)(5)(D).  Two or more companies can be first-filers if they file first on the same day.

42.     The Supreme Court has recognized that "this 180-day period of exclusivity can prove valuable, possibly worth several hundred million dollars" to the first filer. [7]

43.     A first-filer that informs FDA that it intends to wait until all Orange Book listed patents expire before marketing its product does not get a 180-day exclusivity period. Congress created this 180-day period to incentivize generic manufacturers to challenge weak or invalid patents, or to invent around such patents by creating non-infringing generics.

### E.     Brand and Generic Companies Have Strong Financial Incentives to Agree to Anticompetitive Terms

44.     An anticompetitive agreement entered into between the brand and first-filer generic often subjects later ANDA filers to the delayed entry date agreed to between the brand

---

[7] *FTC v. Actavis, Inc.*, 570 U.S., 133 S. Ct. 2223, 2229 (2013).

manufacturer and its conspiring first-filer generic.

45.     In the absence of an anticompetitive agreement between the brand company and the first-filers, the later ANDA filers have pro-competitive incentives.  They are motivated to expend resources to challenge the brand company's patent (knowing that the first-filer generic is also fighting a patent infringement suit) and to enter the market as early as possible.

46.     Thus, some later generics decide to simply give in to, or even join, the conspiracy between the brand company and the first-filer generics and drop their challenges to the brand's patents and stay off the market until after entry by the first-filers.

47.     Such agreements are fundamentally anticompetitive and are contrary to the goals of the Hatch-Waxman statutory scheme.  In particular, they extend the brand manufacturer's monopoly profits by blocking access to more affordable generic drugs, forcing purchasers to buy the expensive brand instead.

48.     While agreements between a branded company and a generic to prevent or delay generic entry have been quite common resulting in a number of class actions being commenced by direct, indirect and competitor Plaintiffs concerning drugs such as Augmentin, BuSpar, Cipro, Loestrin, Lidoderm, Relafen, Solodyn, Tamoxifen, Toprol XL, Wellbutrin SR, and Wellbutrin XL, in this case Plaintiff alleges that the generic manufacturers of Digoxin and Doxycycline entered into unlawful agreements to fix, raise, maintain or stabilize the price of the generic versions of these drugs in violation of federal and state antitrust law, consumer protection and unjust enrichment laws.

## FACTS

### Digoxin

49.     Digoxin is a purified cardiac glycoside similar to digitoxin extracted from the foxglove plant, *Digitalis lanata*.  Digoxin is occasionally used in the treatment of various heart conditions, namely atrial fibrillation, atrial flutter and sometimes heart failure that cannot be controlled by other medication. More than 6.5 million Americans were prescribed the drug in 2012.

50.     For years, the drug sold for pennies a pill, but in the past two years, prices for Digoxin have skyrocketed.  According to a report in *The New York Times*, "[t]he three companies selling the drug in the United States had increased the price they charge pharmacies, at least nearly doubling it since late last year, according to EvaluatePharma, a London-based consulting firm."[8]

51.     The price of Digoxin went up more than 600% over the past two years, but there was no drug shortage, according to the FDA, that could explain the increase.  There was no new patent or formulation of the drug that could account for the rise in prices.  "What had changed most were the financial rewards of selling an ancient, lifesaving drug and company strategies intended to reap the benefits," according to *The New York Times*.[9]

52.     According to *The New York Times*, by late 2013, a number of generic manufacturers had stopped producing and distributing the drug.  This left only two companies

---

[8] Elisabeth Rosenthal, *Rapid Price Increases for Some Generic Drugs Catch Users by Surprise.* N.Y. Times, July 8, 2014, *available at* http://www.nytimes.com/2014/07/09/health/ some-generic-drug-prices-are-soaring.html.

[9] *Id.*

dominant in the market – Lannett and Impax, both relatively small players in the generic market. Then in January of 2014 a Swiss manufacturer began selling an authorized generic, a medicine that tends to be more expensive than a typical generic drug. Following entry by the Swiss company, the companies began increasing the price of Digoxin. According to an analyst interviewed by *The New York Times*, "It's quite difficult to pinpoint who was the catalyst, but we are seeing a big step up."[10]

53.    When *The New York Times* sought comment from Digoxin manufacturers, only Lannett responded. Lannett refused to discuss Digoxin specifically, but stated, "On occasion and for a variety of reasons generic drug makers can and do raise prices." Those factors, it said, included problems acquiring raw material, increased costs of complying with FDA requirements and manufacturers exiting the market. None of those issues, however, explain the spike in Digoxin prices. And, in fact, Lannett has benefitted greatly from the spike, with its sales reported in February 2014 to be the best in the company's history, according to statements by Lannett President and Chief Executive Officer ("CEO") Arthur P. Bedrosian ("Bedrosian") to analysts. Lannett claims to have engaged outside counsel to conduct a review of its pricing practices, but it has not provided the complete results of that review. Instead, Lannett has stated that the results "confirm our belief that the company has and continues to adhere to applicable laws and regulations with regard to pricing of Digoxin."[11]

54.    As analysts have noted: "[a] plausible explanation [for price increases of generic drugs, including generic Digoxin] is that generic manufacturers, having fallen to near historic

---

[10] *Id.*

[11] *Id.*

low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."[12]

55.    The sudden spike in Digoxin pricing is clear and quite stunning: [13]



**Figure 12. Digoxin 0.25 mg Tablet (Lannett) Price per Day of Therapy:**
**(January 1, 2005 to December 31, 2013)**

56.    These price increases were caused by changes made by Lannett, West-Ward, and Impax that were followed by Par and Mylan when they entered the market in 2014 and 2015,

---

[12] Ed Silverman, *Generic Drug Prices Keep Rising, but is a Slowdown Coming?*, THE WALL STREET JOURNAL, April 22, 2015, *available at* http://blogs.wsj.com/pharmalot/2015/04/22/ generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

[13] Figure from *Why Are Some Generic Drugs Skyrocketing in Price?: Hearing before the S. Comm. on Health, Education, Labor and Pensions*, 113th Cong. (Nov. 20, 2014) (statement of Stephen W. Schondelmeyer).

respectively.  In or about November and December of 2013, pricing for .125 mg and .250 mg tablets of Digoxin increased more than 750%, from $.11 and $.12 per tablet to $.91 and $1.01 per tablet.  Between December 2013 and January 2014, the prices of Digoxin jumped again to $1.08 and $1.11 per tablet.  Medication that once cost 11 or 12 cents per pill in early November 2013 cost nearly ten times more by early January 2014.

57.     Data from the National Average Drug Acquisition Cost ("NADAC") on generic Digoxin show price increases that led to identical prices for Lannett's, West-Ward's and Impax's generic Digoxin products.  The same was true of Par's pricing of generic Digoxin in the United States beginning in early 2014 and of Mylan's pricing of generic Digoxin when it entered the market in 2015.

58.     There were no reasonable justifications for this abrupt shift in pricing conduct.  The presence or absence of competitors in the marketplace also does not explain the price of generic Digoxin.  Another chart with data from IMS Health Inc. shows the massive spike in prices:



59.     Following the dramatic price increases in the fall of 2013, Par entered the market in early 2014 and Mylan entered the market in 2015.  Prices did not fall despite the addition of new competitors.  Pricing has remained inflated to this day.

60.     One reason prices might rise could be a supply disruption or shortage, but there was no such disruption or shortage related to Digoxin in the fall of 2013.  As stated on the website of the Generics and Biosimilars Initiative on August 29, 2014, "[a]t the time of the price increases, the U.S. Food and Drug Administration had reported no drug shortages, there was no new patent or new formulation and Digoxin is not difficult to make.  The companies have not yet provided an explanation for the price rise."  And while executives from Lannett, Impax and Par were invited to appear before the Senate Committee to explain the pricing of their generics, they all refused to appear.

61.     Independent pharmacist Robert Frankil provided damning testimony before the Senate Committee:

> A recent example from my own experience is the price of Digoxin – a drug used to treat heart failure.  The price of this medication jumped from about $15 for 90 days' supply, to about $120 for 90 days' supply.  That's an increase of 800%.  One of my patients had to pay for this drug when he was in the Medicare Part D coverage gap in 2014.  Last year, when in the coverage gap he paid the old price.  This year he paid the new price.  Needless to say, the patient was astounded, and thought I was overcharging him.  The patient called all around to try to get the medicine at the old, lower price, but to no avail.  This caused him lots of stress and time, and caused us lots of stress and time in explaining the situation, reversing, and rebilling the claim.  This example is typical of how these price spikes put consumers and pharmacists in a bad position, often grasping at straws for explanations.  And all the while, everyone pays more, including the patient, the pharmacy, and the insurer.[14]

62.     In February 2014, during a call with analysts regarding fourth quarter results for 2013, the former President of Impax, Carole Ben-Maimon, was asked about the "competitive dynamics" related to Digoxin pricing with the entry by Par into the market and whether pricing was "rational."  Dr. Ben-Maimon refused to provide specifics related to Digoxin pricing, stating, "I don't want to really specifically talk about pricing on Digoxin."  She further noted that "the market has been pretty stable with [Lannett] and us . . . .  We're pretty comfortable that what we have done is rational, and will result in ongoing profitability for that product."[15]

63.     By October 2013, the generic Digoxin market was essentially a duopoly controlled by Lannett and Impax.[16] Mylan and Par entered that market in 2014 and 2015, respectively.  Par,

---

[14] *Why Are Some Generic Drugs Skyrocketing in Price?: Hearing before the S. Comm. on Health, Education, Labor and Pensions*, 113th Cong. (Nov. 20, 2014) (statement of Robert Frankil, Rph).

[15] Impax Laboratories, Inc., Q3 2013 Earnings Call Transcript (February 20, 2014) (*available at* http://www.nasdaq.com/aspx/call-transcript.aspx?StoryId=2037633&Title= impax-laboratories-management-discusses-q4-2013-results-earnings-call-*transcript).*

[16] Defendant West-Ward, a subsidiary of Hikma Pharmaceuticals PLC, is also a competitor, but it suspended certain operations in November 2012 after an investigation by the

West-Ward, Mylan, Actavis and Lannett are also major players in the market for generic Doxycycline.

**Doxycycline**

64.     After penicillin revolutionized the treatment of bacterial infections in WWII, many chemical companies moved into the field of discovering antibiotics by bioprospecting. American Cyanamid was one of these, and in the late 1940s chemists there discovered chlortetracycline, the first member of the tetracycline class of antibiotics. Shortly thereafter, scientists at Pfizer discovered terramycin and it was brought to market. Both compounds, like penicillin, were natural products and it was commonly believed that nature had perfected them, and further chemical changes could only degrade their effectiveness. Scientists at Pfizer modified these compounds, which led to the invention of tetracycline itself, the first semi-synthetic antibiotic. Pfizer worked on further analogs and created one with greatly improved stability and pharmacological efficacy: Doxycycline. It was clinically developed in the early 1960s and approved by the FDA in 1967. Doxycycline is an antibiotic that is used in the treatment of a number of types of infections caused by bacteria and protozoa. It is useful for bacterial pneumonia, acne, chlamydia infections, early Lyme disease, cholera and syphilis. It is also useful for the treatment of malaria when used with quinine and for the prevention of malaria. Doxycycline can be used either by mouth or intravenously.

65.     For generic Doxycycline, the pattern of huge price increases started in the fall of 2012, a year earlier than for generic Digoxin.

_____

FDA found problems at its manufacturing facility.   It resumed participation in the generic Digoxin market in July 2013.

66.     The following chart shows the sudden increase in West-Ward's pricing for generic Doxycycline, the average wholesale prices of which went from under $2.50 for a day of therapy for 100 mg capsules of Doxycycline Hyclate to over $11 by January 2013:[17]



67.     The Doxycyline spikes were reported in March 2013:

> Doctors use Doxycycline to treat a wide range of issues, including everything from acne to Lyme disease, anthrax exposure and even heartworm in our pets.
>
> However, the once cheap and effective drug has now dramatically gone up in price, and that has health professionals concerned.
>
> Hospitals like Vanderbilt University Medical Center keep Doxycycline in stock, but some folks worry the cure for their ailment could now be financially out of reach.

---

[17] Figure from *Why Are Some Generic Drugs Skyrocketing in Price?: Hearing before the S. Comm. on Health, Education, Labor and Pensions,* 113th Cong. (Nov. 20, 2014) (statement of Stephen W. Schondelmeyer).

"It's a change that occurred overnight," said Vanderbilt pharmacy manager Michael O'Neil.

Not long ago, the pharmacy at Vanderbilt's hospital could purchase a 50 count bottle of 100 mg Doxycycline tablets for $10, but now the same bottle costs a staggering $250.

"That's concerning to us, both as citizens and practitioners, when you see a huge increase like this in a price of a drug," O'Neil said.

Vanderbilt keeps thousands of Doxycycline pills on hand in the event of a bioterrorist attack, like anthrax, and O'Neil said replacing expired pills is prohibitive.[18]

**Investigations into Defendants' Business Activities by Government Agencies**

68.     The spikes in prices of Doxycycline and Digoxin have resulted in significant government investigations, the results of which are at this time unknown.

69.     According to an SEC filing by Impax:

[o]n November 3, 2014, a sales representative of Impax Laboratories, Inc. received a subpoena from the Justice Department's Antitrust Division requesting the production of documents to and testimony before the Grand Jury of the Eastern District of Pennsylvania.  The request relates to any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications.[19]

70.     Subsequently, in an SEC Form 10-Q filed on May 11, 2015, Par indicated that:

[o]n December 5, 2014, we received a subpoena from the Antitrust Division of the DOJ requesting documents related to communications with competitors regarding our authorized generic version of Covis's Lanoxin® (Digoxin) oral tablets and our generic Doxycycline products.[20]

---

[18] Alan Frio, *Sudden increase in cost of common drug concerns many*, WSMV.COM, March 12, 2016,      http://www.wsmv.com/story/21616095/sudden-increase-in-cost-of-common-drug-concerns -many.

[19] Impax Laboratories, Inc., Current Report (Form 8-K) (November 3, 2014).

[20] Par Pharmaceutical Companies, Inc., Quarterly Report (Form 10-Q) at 39 (May 11, 2015).

71.     This assertion was repeated in Impax's Form 10-Q filed on August 10, 2015.[21]

72.     Lannett reported that on November 3, 2014, the Senior Vice President of Sales and Marketing of the company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoena requests corporate documents of Lannett relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period.[22]

73.     In February 2014, Lannett touted its record sales: "For the fiscal 2014 second quarter, we recorded the highest net sales, gross margin and net income in our company's history." Lannett noted that the record results were "driven by price increases, strong sales of existing products and favorable product mix."[23] In a February 6, 2014 earnings conference call, Lannett further recognized the "key products that are driving [gross margin] from a price-increase perspective . . . from a magnitude perspective, are the levothyroxine sodium product, and also Digoxin."[24]

74.     During the same earnings conference call, the President and CEO of Lannett was asked whether and to what extent the entry into the market by Par of an authorized generic

_____

[21] Impax Laboratories, Inc., Quarterly Report (Form 10-Q) at 39 (August 10, 2015).

[22] Lannet Company, Inc., Current Report (Form 8-K) (December 5, 2014).

[23] Press Release, Lannet Company, Inc., Net Sales of $67 Million, Gross Margin of 61%, EPS of $0.46 - All the Highest in Company History (Feb. 6, 2014) (*available at* http://www.reuters.com/article/pa-lannett-companyidUSnBw066400a+100+BSW20140206).

[24] Lannett Company, Inc., Q2 2014 Earnings Conference Call Transcript (Feb. 6, 2014) (*available at* http://www.nasdaq.com/aspx/call-transcript.aspx?StoryId=2002271&Title= lannett-management-discusses-q2-2014-results-earnings-call-transcript).

version of Digoxin would impact sales.  CEO Bedrosian stated that Lannett viewed Par as "one of our rational competitors in the marketplace."  This, he said meant that while Par would "capture a certain market share," adding "movement behind the brand" "actually expands the generic market as well."[25]

75.     When pressed by an analyst regarding what he meant by calling Par a "rational competitor," Bedrosian noted "we're not troubled by their pricing in the marketplace, not at all." When further asked whether the pricing was in line with Lannett's and whether Par "followed suit in terms of [Lannett's] price increase," Bedrosian claimed, "It's hard to say what's in line. It's not doing us any harm, but I don't know how you would describe what's in line.  I don't talk to them, so I don't really know how they determine their pricing."  He further noted that Par's "prices that they're quoting are not doing us any harm at all."[26]

76.     According to Lannett's Annual Report for 2014, its sales of Digoxin for the year ending on June 30, 2014 was $54 million.

77.     On February 4, 2015, in another quarterly earnings call, Bedrosian confirmed there would be a moratorium on price competition.  He stated: "I think you're going to find more capital pricing [in the generic marketplace], more – I'll say less competition, in a sense.  You won't have price wars."  In his view, "I just don't see the prices eroding like they did in the past."[27]

---

[25] *Id.*

[26] *Id.*

[27] Lannett Company, Inc., Q2 2015 Results Earnings Conference Call Transcript (Feb. 4, 2015) (*available at* http://www.nasdaq.com/aspx/call-transcript.aspx?StoryId=2885806& Title=lannett-s-lci-ceo-arthur-bedrosian-on-q2-2015-results-earnings-call-transcript).

78.     According to Lannett, irrational competitors were those who competed on price in order to obtain market share.  The statement is a signal that Lannett understood that Impax, Par and Mylan, among others, were no longer interested in competing on price, an understanding that could only exist if the three firms had reached a consensus on how to price.  Bedrosian's statements demonstrate the parties had agreed.  Bedrosian was also certain of reaching a similar consensus with Mylan.

79.     Impax's CEO, Frederick Wilkinson, made similar statements during the company's third quarter 2014 earnings call: "we've done what most of the other generic houses have done.  We look at opportunities.  We look at how competition shifts.  We look at where there may be some market movement that will allow us to take advantages on price increases and we've implemented those."[28]

80.     This meeting of the minds among the competing sellers of generic Digoxin and generic Doxycycline resulted in enormous profits.  Bedrosian noted in the February 4, 2015 earnings call that Lannett "recorded the highest net sales and net income in our company's history."  Gross profits in the first six months of the 2015 fiscal year were $158.8 million or 76% of net sales, compared with $42.3 million or 37% of net sales during the previous fiscal year. Generic Digoxin pricing played a big role in its success.

---

[28] Impax Laboratories, Inc., Q3 2014 Earnings Conference Call (November 4, 2014) (*available at* http://www.nasdaq.com/aspx/call-transcript.aspx?StoryId=2638955&Title= impax-laboratories-ipxl-ceo-frederick-wilkinson-on-q3-2014-results-earnings-call-transcript).

81.     According to its 2014 SEC Form 10-K filed on February 26, 2015, Impax had $596 million in total revenues in the 2014 calendar year, compared to $511 million in 2013 – a 17% increase.  The primary factor in this growth was "higher sales of our Digoxin."[29]

82.     In addition to the subpoenas and interrogatories issued by the DOJ and the Connecticut Attorney General's Office, Congress has taken an interest in the spiraling costs of generic drugs, holding hearings and calling for an investigation.  In October 2014 Senator Bernie Sanders (I-Vt.) and U.S. Representative Elijah E. Cummings (D-Md.) launched an investigation into soaring generic drug prices:

> We are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses," Sanders, chairman of a Senate healthcare subcommittee, and Cummings, ranking member of the House Oversight Committee, wrote in letters to 14 pharmaceutical companies.
>
> …
>
> Cummings and Sanders cited a survey that found pharmacists across the country "'have seen huge upswings in generic drug prices that are hurting patients'" and having a "'very significant'" impact on pharmacists' ability to continue serving patients.  The study for the National Community Pharmacists Association also found some patients refused to fill needed prescriptions because of rising prices.
>
> "It is unacceptable that Americans pay, by far, the highest prices in the world for prescription drugs.  Generic drugs were meant to help make medications affordable for the millions of Americans who rely on prescriptions to manage their health needs.  We've got to get to the bottom of these enormous price increases," Sanders said.
>
> "When you see how much the prices of these drugs have increased just over the past year, it's staggering, and we want to know why," said Cummings. "I am very pleased that Chairman Sanders has joined me in this bicameral investigation

---

[29] Impax Laboratories, Inc., Annual Report (Form 10-K) at 61 (February 22, 2015).

because in some cases these outrageous price hikes are preventing patients from getting the drugs they need."[30]

83.    In letters to the heads of a number of companies that make Doxycycline and Digoxin, Sanders and Cummings wrote and requested information about the escalating prices. According to the letters, which cited information provided by the HSCA, the average price charged for generic Doxycycline increased by *as much as 8,281%* over the span of less than a year.[31]

84.    The letters sought documents and information from 2012 to the present, including total gross revenues from the companies' sales of the suspect drugs; the dates, quantities, purchasers and prices paid for all sales of the drugs; total expenses relating to the sales of the drugs, as well as the specific amounts for manufacturing, marketing and advertising, and purchases of active pharmaceutical ingredients, if applicable; sales contracts or purchase agreements for active pharmaceutical ingredients for the drugs, including any agreements relating to exclusivity, if applicable; a description and valuation of the specific financial and non-financial factors that contributed to the various companies' decisions to increase the prices of the drugs; any cost estimates, profit projections, or other analyses relating to the companies' current and future sales of the drugs; prices of the drugs in all foreign countries or markets, including price information for the countries paying the highest and lowest prices; and the identity of

---

[30] Press Release, U.S. Sen. Bernie Sanders, Congress Investigating Why Generic Drug Prices Are Skyrocketing (Oct. 2, 2014) (*available at* http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing).

[31] Letter from U.S. Sen. Bernie Sanders and U.S. Rep. Elijah E. Cummings to Arthur P. Bedrosian, President and CEO, Lannett Company, Inc. (Oct. 2, 2014) (*available at* http://www.sanders.senate.gov/download/letter-to-mr-bedrosian-president-and-ceo-lannett-company-inc?inline=file).

official(s) responsible at each company for setting the prices of these drugs over the above time period.  The letter sought responses by October 23, 2014.[32]

85.    Following on the heels of the congressional investigation, the Office of Inspector General ("OIG") launched its own generic pricing investigation.  The OIG reviewed generic drug price increases under the Medicaid drug rebate program by examining the quarterly average manufacturer prices from 2005 through 2014 to determine the extent to which manufacture prices exceeded the specified inflation factor.  Brand name manufacturers are compelled to pay additional rebates when their drugs' average manufacture prices increase by more than a specified inflation factor, but there is no such requirement for generic manufacturers.  The OIG calculated that Medicaid would have received an additional $1.4 billion in rebates if the requirement was extended to generic drugs, and recommended legislation to do just that.[33]

86.    The generic manufacturers are part of a trade organization that may be facilitating communications concerning the unlawful pricing of generic drugs. The Generic Pharmaceutical Association (GPhA) is the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry.  GPhA was founded in 2000, following the merger of three industry trade organizations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers and the National Pharmaceutical Alliance.  The three groups represented similar members, with the former two

---

[32] *Id.* at 3.

[33] Office of the Inspector General, Average Manufacture Prices Increased Faster than Inflation for Many Generic Drugs (December 2015) (*available at* http://oig.hhs.gov /oas/reports/region6/61500030.pdf).

placing a greater emphasis on scientific issues and the latter focusing on sales and marketing issues. As GPhA, the industry now speaks with a stronger, unified voice before federal and state lawmakers, regulatory policymakers and international agencies.

## EFFECTS ON INTERSTATE AND INTRASTATE COMMERCE

87.    At all material times, Defendants manufactured, marketed, distributed, and sold substantial amounts of generic Doxycycline and Digoxin, in a continuous and uninterrupted flow of commerce across state and national lines throughout the United States.

88.    At all material times, Defendants transmitted funds, and contracts, invoices, and other forms of business communications and transactions, in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of generic Doxycycline and Digoxin.

89.    In furtherance of their unlawful efforts, Defendants employed the United States mails and interstate and international telephone lines, and means of interstate and international travel. Defendants' activities were within the flow of, and have substantially affected (and continue to substantially affect) interstate commerce.

90.    Defendants' anticompetitive conduct had substantial intrastate effects in that, *infra*, retailers within each state were foreclosed from offering substantially less expensive generic Doxycycline and/or Digoxin. The complete foreclosure of less expensive generic Doxycycline and/or Digoxin directly impacted and disrupted commerce for Plaintiff within numerous indirect purchaser states. Statements by Lannett further demonstrate Impax, Par and Mylan are its only serious competitors in that market. The number of meaningful competitors in the generic Doxycycline market is also limited.

91.     There are significant barriers to entry in the generic pharmaceutical arena which make it more difficult for competitors to timely enter and which help Defendants to facilitate the operation of a cartel.  Indeed, Par's own 2014 Form 10-K provides that its business is to develop and commercialize "generic drugs with limited competition, high barriers to entry and longer life cycles."[34] While there has been some limited market entry, that entry has not stymied price-fixing in the industry.

92.     In order to be successful, collusive agreements require a level of trust among the conspirators.  Collaboration fostered through industry associations facilitate relationships between individuals who would otherwise be predisposed to compete vigorously with each other.  Here, the Defendants are members of or participants in the GPhA, which describes itself on its website as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."[35]  Thus, representatives of the Defendants have opportunities to meet and conspire at functions of this group, as well as at industry healthcare meetings.  In addition, as noted above, Lannett's CEO Bederosian has made positive assertions about how Lannett and its competitors view the competitive landscape for generic drugs, and that none of them will compete on price for the foreseeable future.  Such statements indicate there have been contacts and communications among supposed competitors.  The Grand Jury subpoenas discussed above lend further support to the conclusion that intercompetitor communications occurred with respect to the pricing of generic Digoxin.  Indeed, according to

---

[34] Par Pharmaceutical Companies, Inc., Annual Report (Form 10-K) at 13 (March 3, 2015)
[35] GPhA, The Association, http://www.gphaonline.org/about/the-gpha-association (last visited April 7, 2016).

the previously-identified PaRR report, prosecutors are taking a close look "'at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers.'"[36]

## MARKET EFFECTS

93.     Defendants' anticompetitive conduct had the purpose and effect of restraining competition unreasonably and injuring competition by insulating their generic products from generic price competition. Defendants' unlawful actions allowed them to maintain supra-competitive prices to the detriment of Plaintiff. Defendants' anticompetitive conduct impaired generic price competition on the merits.

94.     Generic price competition enables purchasers to purchase generic versions of a drug at substantially lower prices.

95.     But for Defendants' anticompetitive conduct, Plaintiff would have paid less for generic Doxycycline and Digoxin by purchasing generic Doxycycline and Digoxin in a fully competitive market.

96.     As a direct and proximate result of Defendants' illegal conduct, Plaintiff was compelled to pay, and did pay, artificially inflated prices for generic Doxycycline and Dioxin.

97.     Defendants' anticompetitive conduct has substantial intrastate effects in that, *infra*, retailers within each state are foreclosed from offering less expensive generic Doxycycline and Digoxin inside each respective state. The foreclosure of these generic drugs directly impacts and disrupts commerce.

---

[36] Palmer, *supra* note 4.

98.     As a direct and proximate result of Defendants' unlawful anticompetitive scheme and wrongful conduct, Plaintiff has sustained substantial losses and damage to its business and property in the form of overcharges it paid for generic Doxycycline and Digoxin the exact amount of which will be proven at trial.

99.     Defendants' unlawful conduct deprived Plaintiff the benefits of free and unrestrained competition that the Hatch-Wazman Act and other antitrust laws were designed to ensure.

## ANTITRUST IMPACT

100.     During the Class Period, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, maintain or stabilize the prices of generic drugs, including Digoxin and/or Doxycycline in the United States and its territories.

101.     In formulating and effectuating the contract, combination or conspiracy, the Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the price of generic Digoxin and/or generic Doxycycline sold in the United States and its territories.  These activities included the following:

a.     Defendants participated in meetings and/or conversations to discuss the price of generic Digoxin and/or generic Doxycycline in the United States;

b.     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Digoxin and/or generic Doxycycline sold in the United States;

c.      Defendants agreed during those meetings and conversations to fix the prices of generic Digoxin and/or generic Doxycycline; and

d.      Defendants issued price announcements and price quotations in accordance with their agreements.

102.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

103.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiff and members of the Class (defined herein) purchased generic Digoxin and/or generic Doxycycline from Defendants (or their subsidiaries or controlled affiliates) or their co-conspirators at inflated and supracompetitive prices.

104.    Defendants' contract, combination, or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of §1 of the Sherman Act (15 U.S.C. §1) and §3 of the Sherman Act (15 U.S.C. §3) and the laws of various states.

105.    As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Class have been injured in their business and property in that they have paid more for generic Digoxin and/or generic Doxycycline than they would have paid in a competitive market.

106.    The unlawful contract, combination or conspiracy has had the following effects, among others:

a.      Price competition in the market for generic Digoxin and/or generic Doxycycline has been artificially restrained;

b.      Prices for generic Digoxin and/or generic Doxycycline sold by Defendants have been fixed, raised, maintained, or stabilized at artificially high and non-competitive levels; and

34

      c.    Purchasers of generic Digoxin and/or generic Doxycycline from Defendants have been deprived of the benefit of free and open competition in the market for generic Digoxin and/or generic Doxycycline.

107.    During the relevant period, Plaintiff purchased substantial amounts of generic Doxycycline and Digoxin indirectly from Defendants.  As a result of Defendants' illegal conduct, Plaintiff was compelled to pay, and did pay, artificially inflated prices for generic Doxycycline and Digoxin.  Those prices were substantially greater than those that Plaintiff would have paid absent the illegal conduct alleged herein.

108.    As a consequence, Plaintiff has sustained substantial loss and damage to its business and property in the form of overcharges.  The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

109.    General economic theory recognizes that any overcharge at a higher level of distribution in the chain of distribution for a product results in higher prices at every level below.  In *Federal Antitrust Policy*, Herbert Hovenkamp states that "[e]very person at every stage in the chain will be poorer as a result of the [anticompetitive] price at the top."[37]  He also acknowledges that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."[38]

---

[37] Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competitions and Its Practice* 624 (West Group, 1999).

[38] *Id.*

110.    Defendants' anticompetitive conduct enabled them to charge consumers indirectly and third-party payors prices in excess of what Defendants otherwise would have been able to charge absent Defendants' anticompetitive conduct.

111.    The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct. The inflated prices the Plaintiff paid are traceable to, and the foreseeable result of, the overcharges by Defendants.

## CLASS ACTION ALLEGATIONS

112.    Plaintiff brings this action as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.  Plaintiff seeks to certify two classes, the first under federal antitrust laws and the second under the various state laws detailed in Counts III, IV and V.

113.    The Nationwide Class is brought under Fed. R. Civ. P. 23(a) and (b)(2) and seeks equitable and injunctive relief.  The Nationwide Class is defined as follows:

> All persons or entities in the United States and its territories who indirectly purchased, paid or provided reimbursement for some or all of the purchase price of generic Doxycycline or Digoxin in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, at any time during the period October 1, 2012 to the present and continuing until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").  For purposes of the Class definition, persons or entities "purchased" generic Doxycycline or Digoxin if they paid or reimbursed some or all of the purchase price.

114.    This Class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Digoxin or Doxycycline products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance

covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Digoxin or Doxycycline products were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

115.    Plaintiff also brings this action as a class action under Fed. R. Civ. P. 23(a) and (b)(3) seeking damages under the state antitrust, common law and consumer protection laws of the states listed below (the Indirect Purchaser States).  This class is the Damages Class and is defined as follows:

> All persons or entities in the United States and its territories who indirectly purchased, paid or provided reimbursement for some or all of the purchase price of generic Doxycycline or Digoxin in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, at any time during the period October 1, 2012 to the present and continuing until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").  For purposes of the Class definition, persons or entities "purchased" generic Doxycycline or Digoxin if they paid or reimbursed some or all of the purchase price.

116.    This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Digoxin or Doxycycline products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Digoxin or Doxycycline products were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

117.    Due to the nature of the trade or the commerce involved, Plaintiff does not know the exact number of Class members involved; however, Plaintiff believes that Class members are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

118.    Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and Class members purchased generic Doxycycline and/or generic Digoxin from Defendants at supracompetitive prices. Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Class.

119.    Plaintiff is represented by counsel who is competent and experienced in the prosecution of complex class action litigation and antitrust actions involving branded and generic pharmaceutical products.

120.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

121.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability, damages and restitution.  Among the questions of law and fact common to the Class are:

    a.    Whether Defendants and their co-conspirators colluded to fix, raise, maintain, and/or stabilize the price of generic Doxycycline and/or generic Digoxin in the United States;

    b.    Whether Defendants violated §1 of the Sherman Act;

    c.    Whether Defendants violated §3 of the Sherman Act;

d.      Whether Defendants violated the antitrust, consumer protection and unjust enrichment laws of the Indirect Purchaser States;

e.      The duration of the conspiracy alleged in this Complaint;

f.      The nature and character of the acts performed by Defendants in furtherance of the conspiracy;

g.      Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

h.      Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of §1 of the Sherman Act.

122.    A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who could not individually afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action likely presents no difficulties in management that would preclude its maintenance as a class action.  Finally, the Class is readily ascertainable.

## COUNT I

### Violation of §1 of the Sherman Act on Behalf of Plaintiff and the Class

123.    Plaintiff realleges and incorporates by reference all the above allegations as if fully set forth herein.

124.    During Class Period, Defendants engaged in a continuing contract, combination and/or conspiracy to unreasonably restrain trade and commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1, by artificially reducing or eliminating competition in the market for generic Doxycycline and/or generic Digoxin and engaging in a conspiracy to artificially fix, raise,

maintain, and/or stabilize the prices for generic Doxycycline and/or Digoxin in the United States.

125.     In particular, Defendants have agreed, contracted, combined, and/or conspired to fix, raise, maintain, or stabilize the prices of generic Doxycycline and/or generic Digoxin in the United States.

126.     In formulating and effectuating their contract, combination and/or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain, and/or stabilize the prices of generic Doxycycline and/or generic Digoxin in the United States.

127.     Defendants' contract, combination and/or conspiracy consisted of a continuing agreement, understanding and concerted action among Defendants in the unlawful restraint of trade.

128.     Defendants' conspiracy had the effect of artificially inflating the price of generic Doxycycline and/or generic Digoxin in the United States.

129.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the other members of the Class paid more for generic Doxycycline and/or generic Digoxin than they otherwise would have paid in the absence of Defendants' unlawful conduct.

130.     By reason of Defendants' unlawful conduct, Plaintiff and members of the Class have been deprived of free and open competition in the purchase of generic Doxycycline and/or generic Digoxin.

131.     As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Class have been injured and damaged in their business and property.

132.     Plaintiff seeks injunctive relief.

## COUNT II

### Violation of §3 of the Sherman Act on Behalf of Plaintiff and the Class

133.     Plaintiff realleges and incorporates by reference all the above allegations as if fully set forth herein.

134.     During Class Period, Defendants engaged in a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of §3 of the Sherman Act, 15 U.S.C. §3, by artificially reducing or eliminating competition in the market for generic Doxycycline and/or generic Digoxin.  Defendants engaged in a conspiracy to artificially fix, raise, maintain, and/or stabilize the prices for generic Doxycycline and/or generic Digoxin in the United States, its territories and the District of Columbia.

135.     In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the prices of generic Doxycycline and/or generic Digoxin in the United States, its territories and the District of Columbia.

136.     Defendants' combination or conspiracy consisted of a continuing agreement, understanding and concerted action among Defendants.

137.     Defendants' conspiracy had the effect of artificially inflating the price of generic Doxycycline and/or generic Digoxin in the United States, its territories and the District of Columbia.

138.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the other members of the Class paid more for generic Doxycycline and/or generic Digoxin than they otherwise would have paid in the absence of Defendants' unlawful conduct.

139.    By reason of Defendants' unlawful conduct, Plaintiff and members of the Class have been deprived of free and open competition in the purchase of generic Doxycycline and/or generic Digoxin.

140.    As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Class have been injured and damaged in their business and property in an amount to be determined at trial.

141.    Plaintiff seeks injunctive relief.

## COUNT III

### Violation of State Antitrust Statutes on Behalf of Plaintiff and the Class

142.    Plaintiff realleges and incorporates by reference all the allegations set forth above as if fully set forth herein.

143.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Digoxin and/or generic Doxycycline in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

144.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for generic Digoxin and/or generic Doxycycline and to allocate

customers for generic Digoxin and/or generic Doxycycline in the United States and its territories.

145.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the contract, combination, or conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic Digoxin and/or generic Doxycycline at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to generic Digoxin and/or generic Doxycycline provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

146.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize prices of generic Digoxin and/or generic Doxycycline.

147.    By engaging in the anticompetitive conduct alleged herein, Defendants have intentionally and unlawfully engaged in one or more contracts, combinations and/or conspiracies  in restraint of trade in violation of the following state laws:

a.    Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Ariz. Rev. Stat. §§ 44–1401, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Arizona  by members of the Class.

b.    Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Cal. Bus. & Prof. Code §§

16700, *et seq.*, and Code §§ 17200, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in California by members of the Class.

c.      Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of D.C. Code Ann. §§ 28-4503, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in the District of Columbia by members of the Class.

d.      Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Florida by members of the Class, and this conduct constitutes a predicate act under the Florida Deceptive Practices Act.

e.      Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Hawaii Code §§ 480, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Hawaii by members of the Class.

f.      Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Iowa Code §§ 553, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Iowa by members of the Class.

g.      Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Kansas by members of the Class.

h.     Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Maine by members of the Class.

i.     Defendant have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Mass. Ann. Laws ch. 93, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Massachusetts by members of the Class.

j.     Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Michigan by members of the Class.

k.     Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Minn. Stat. §§ 325D.52, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Minnesota by members of the Class.

l.     Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Mississippi by members of the Class.

m.     Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Neb. Rev. Stat. Ann. §§

59-801, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Nebraska by members of the Class.

n.      Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Nevada by members of the Class, in that thousands of sales of generic Doxycycline and/or Digoxin took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

o.      Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in New Mexico by members of the Class.

p.      Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in New York by members of the Class.

q.      Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in North Carolina by members of the Class.

r.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in North Dakota by

members of the Class.

s.      Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of 10 L.P.R.A. § 258 with respect to purchases of generic Doxycycline and/or Digoxin in Puerto Rico by members of the Class.

t.      Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-1, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Rhode Island by members of the Class.

u.      Defendants have intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in South Dakota by members of the Class.

v.      Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Tennessee by members of the Class, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of end-payors in Tennessee paying substantially higher prices for generic Doxycycline and/or Digoxin at Tennessee pharmacies.

w.      Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Utah

by members of the Class.

x.       Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Vt. Stat. Ann. tit. 9. §§ 2453, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Vermont by members of the Class.

y.       Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in West Virginia by members of the Class.

z.       Defendants have intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Wis. Stat. §§ 133.01, *et seq.*, with respect to purchases of generic Doxycycline and/or Digoxin in Wisconsin by members of the Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher price for generic Doxycycline and/or Digoxin at Wisconsin pharmacies.

## COUNT IV

## Violation of State Consumer Protection Statutes on Behalf of Plaintiff and the Damages Class

148.     Plaintiff realleges and incorporates by reference all the allegations set forth above as if fully set forth herein.

149.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

150.    As a direct and proximate result of Defendants' unfair competition or unfair, unconscionable, deceptive acts or practices in violation of the state consumer protection statutes listed below, Plaintiff and Class members were deprived of the opportunity to purchase a less expensive generic version of Doxycycline and/or Digoxin and forced to pay higher prices.

151.    By engaging in the foregoing conduct, Defendants have violated the following state unfair and deceptive trade practices and consumer fraud laws:

a.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. §§ 44–1522, *et seq.*

b.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

c.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices  or made false representations  in violation  of D.C.  Code §§ 28-3901, *et seq.*

d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.*

e.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. §§ 480, *et seq.*

f.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code §§ 714.16, *et seq.*

g.      Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of Idaho Code Ann. §§ 48-601, *et seq.*

h.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. §§ 505/1, *et seq.*

i.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. Ann. §§ 50-623, *et seq.*

j.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of  Me. Rev. Stat. tit. 5 §§ 207, *et seq.*

k.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, *et seq.*

l.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws Ann. §§ 445.901, *et seq.*

m.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §§ 8.31, *et seq.*

n.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mo. Ann. Stat. §§ 407.010, *et seq.*

o.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code Ann. §§ 30-14-101, *et seq.*

p.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, *et seq*

q.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §§ 598.0903, *et seq.*

r.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq.*

s.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §§ 57-12-1, *et seq.*

t.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349, *et seq.*

u.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §§ 75-1.1, *et seq.*

v.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code §§ 51-15-01, *et seq.*

w.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

x.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §§ 37-24-1, *et seq.*

y.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code Ann. §§ 47-18-101, *et seq.*

z.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. §§ 13-11-1, *et seq.*

aa.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9 §§ 2451, *et seq.*

bb.     Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of W. Va. Code §§ 46A-6-101, *et seq.*

152.     Plaintiff and the Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair, unconscionable or deceptive acts alleged herein.  Their injury consists of paying higher prices for generic Doxycycline and/or Digoxin than they would have paid in the absence of such violations.  This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

## COUNT V

### Unjust Enrichment on Behalf of Plaintiff and the Damages Class

153.     Plaintiff realleges and incorporates by reference all the allegations set forth above as if fully set forth herein.

154.     Defendants have benefited from the anticompetitive profits on the sale of generic Doxycycline and/or Digoxin resulting from the unlawful and inequitable acts alleged in this Complaint.

155.     Defendants' financial benefit resulting from unlawful and inequitable conduct is traceable to overpayments for generic Doxycycline and/or Digoxin by Plaintiff and members of the Class.

156.     Plaintiff and the Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

157.     It would be futile for Plaintiff and the Class to seek a remedy from any party with whom they had privity of contract.

158.    It would be futile for Plaintiff and the Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it indirectly purchased generic Doxycycline and/or Digoxin, as they are not liable and would not compensate Plaintiff for unlawful conduct caused by Defendants.

159.    The economic benefit of overcharges and unlawful monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Doxycycline and/or Digoxin is a direct and proximate result of Defendants' unlawful practices.

160.    The financial benefits derived by Defendants rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anticompetitive prices during the Class Period, injuring them to the benefit of Defendants.

161.    It would be inequitable under unjust enrichment principles in the District of Columbia and each of the fifty states, except for Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Doxycycline and/or Digoxin derived from Defendants' anticompetitive, unfair, and unconscionable methods, acts, and trade practices alleged in this complaint.

162.    Defendants are aware of and appreciated the benefits bestowed upon them by Plaintiff and the Class.

163.    Defendants should be compelled to disgorge in a common fund for the benefit Plaintiff and the Class all unlawful or inequitable proceeds they received.

164.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff and the Class.

165.    Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

B.    Defendants have engaged in a contract, combination, or conspiracy in violation of §1 of the Sherman Act, 15 U.S.C. §1, and §3 of the Sherman Act, 15 U.S.C. §3, and Plaintiff and the members of the Class have been injured in their business and property as a result of Defendants' violation;

C.    Plaintiff and the members of the Class are entitled to recover damages sustained by them, as provided by state antitrust laws, consumer protection laws, and unjust enrichment laws;

D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.    Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.    Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.     Plaintiff and members of the Class receive such other or further relief as may be just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated:   May 12, 2016
         Providence, RI

Respectfully submitted,
**MOTLEY RICE LLC,**

*/s/ Vincent L. Greene*
Robert J. McConnell, Esq.  (#3888)
Vincent L. Greene, Esq.  (#5971)
321 South Main Street, 2nd Fl.
Providence, RI 02903
(401) 457-7730
(401) 457-7708 Fax